IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCHOOL DISTRICT OF PHILADELPHIA | : | CIVIL ACTION NO. 14-4910 |
| v. | : | |
| ROBERT KIRSCH and KAREN MISHER, Parents of A.K., a minor | : | |

| | | |
|---|---|---|
| SCHOOL DISTRICT OF PHILADELPHIA | : | CIVIL ACTION NO. 14-4911 |
| v. | : | |
| ROBERT KIRSCH and KAREN MISHER, Parents of N.K., a minor | : | |

O'NEILL, J.                                             November 30, 2015

**MEMORANDUM**

This litigation involves consolidated civil actions brought by plaintiff, the School District of Philadelphia and removed to this Court from the Commonwealth Court by defendants Robert Kirsch and Karen Misher, parents of twin siblings A.K. and N.K. When the instant motions were filed, A.K. and N.K. were first-grade students enrolled at A Step Up Academy (ASUA), a private school for students with autism. Civ. A. 14-4910, Dkt. No. 21 at ECF p. 7; Civ. A. 14-4911, Dkt. No 20 at ECF p. 2.[1] The claims in this action relate to decisions of Anne L. Carroll, the Pennsylvania Special Education Due Process Hearing Officer, dated July 2, 2014 in ODR Docket No. 14361-13-14-KE and dated July 3, 2014 in ODR Docket No. 14361-13-14-KE, which were in favor of parents on some claims and in favor of the District on others. See A.K. Decision at 2; N.K. Decision at 2. The parties' claims arise under the Individuals with

---

[1]     Because of parallels between the documents filed in Civ. A. 14-4910 and Civ. A. 14-4911 and the allegations, facts and arguments therein, citations to docket entries in this Opinion will be to documents docketed in Civ. A. No. 14-4910 unless otherwise noted.

Disabilities Education Act (IDEA), 20 U.S.C. § 1400, et seq., Section 504 of the Rehabilitation

Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act (ADA), 42

U.S.C. § 12131.  Now before me are:  (1) motions by the District for judgment on the

administrative record and on parents' counterclaims[2] and parents' response[3]; (2) parents' cross-

motions for judgment on the administrative record[4] and the District's response[5]; and (3) motions

by the District to dismiss parents' counterclaims, or in the alternative for summary judgment[6]

and parents' response[7].  Also before me are parents' motion for leave to amend their

counterclaims[8] and the District's response thereto.[9]  For the reasons that follow, I will grant in

part and deny in part the cross-motions for judgment on the administrative record and will affirm

the Hearing Officer's decisions.  I will also grant in part and deny in part the District's motion to

dismiss parents' counterclaims and will deny parents' motion for leave to amend their

counterclaims.

## BACKGROUND

### I.    IDEA

IDEA's aim is "to ensure that all children with disabilities have available to them a free

appropriate public education," or FAPE.  20 U.S.C. § 1400(d)(1)(A).  FAPE is "special

education and related services" that:

> (A) have been provided at public expense, under public supervision and direction,
> and without charge;

---

[2]    Filed as Dkt. No. 21 in Civ. A. 14-4910 and Dkt. No. 20 in Civ. A 14-4911.
[3]    Filed as Dkt. No. 26 in Civ. A. 14-4910.
[4]    Filed as Dkt. No. 22 in Civ. A. 14-4910 and Dkt. No. 18 in Civ. A. 14-4911.
[5]    Filed as Dkt. No. 25 in Civ. A. 14-4910.
[6]    Filed as Dkt. No. 20 in Civ. A. 14-4910 and Dkt. No. 19 in Civ. A. 14-4911.
[7]    Filed as Dkt. No. 24 in Civ. A. 14-4910.
[8]    Filed as Dkt. No. 27 in Civ. A. 14-4910.
[9]    Filed as Dkt. No. 28 in Civ. A. 14-4910.

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary school or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under [20 U.S.C.] section 1414(d) . . . .

20 U.S.C. § 1401(9). The primary mechanism for delivering FAPE is the individualized

education program or IEP –

> a written statement that tailors educational services to meet the specific needs of a child with a disability, and it includes, but is not limited to statements regarding a child's present levels of academic achievement, measurable annual goals, related services and supplementary aids to be provided to a child, and any individual appropriate accommodations necessary to measure academic achievement and functional performance.

L.M. ex. rel. M.M. v. Downingtown Area Sch. Dist., No. 12-5547, 2015 WL 1725091, at * 2

(E.D. Pa. Apr. 15, 2015), citing 20 U.S.C. § 1414(d).

Parents who believe their child's IEP is inadequate may request an administrative due

process hearing before an impartial hearing officer. See 20 U.S.C. § 1415(f). Following such a

hearing, "[a]ny party aggrieved by the findings and decision . . . shall have the right to bring a

civil action  . . . in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A).

## II.     IEPs for the 2013-14 School Year

A.K. and N.K. are "both IDEA eligible in the autism disability category." A.K. Decision

at 2, 3; N.K. Decision at 2, 3. On June 12, 2012, in anticipation of the twins' eventual transition

from early intervention[10] to a school-age program, parents and the District met for an IEP

meeting to review an IEP and Notice of Recommended Educational Plan (NOREP) proposed by

---

[10]     For eligible children under the age of three, the IDEIA requires that the state must provide early intervention services that "are designed to meet the developmental needs of an infant or toddler." 20 U.S.C. § 1432(4)(C).

the District for the 2012-13 academic year.  A.K. Decision at 14, ¶ 77; N.K. Decision at 4, ¶ 8.

Parents signed the NOREP on the date of the IEP meeting, but in August 2012 notified the

District that they were electing to keep A.K. and N.K. in early intervention for another school

year.[11]  A.K. Decision at 4, ¶ 9; N.K. Decision at 4, ¶ 9.  Parents contend that "[t]here was no

reason for Parents to provide a detailed list of their concerns at that point, as they knew that the

IEP process would begin anew prior to the 2013-14 school year."  Dkt. No. 26 at ECF p. 8.

In February 2013, parents contacted the District about the twins' kindergarten placement

for the 2013-14 academic year.  A.K. Decision at 5, ¶ 12; N.K. Decision at 5, ¶ 12.  Parents were

told that after they re-registered A.K. and N.K. for kindergarten, the District would send

permissions to reevaluate (PTREs) for updated evaluations.  Id.  On April 18, 2013 parents

enrolled the twins and returned to the District PTREs and Parent Input Forms which the District

had sent to them on April 12, even though parents had yet to complete the enrollment process.

A.K. Decision at 5, ¶¶ 13-14; N.K. Decision at 5, ¶¶ 13-14.  Parents requested the opportunity to

visit a District kindergarten classroom and advised the District that they had contracted for an

independent evaluation which they expected to be completed by the end of April, with a report

by mid-May.[12]  A.K. Decision at 5, ¶ 15; N.K. Decision at 5, ¶ 15.

At the beginning of June 2013 the District's school psychologist contacted the

---

[11]     The twins were eligible either to transition to the District or to remain in early
intervention during the 2012-13 academic year.  A.K. Decision at 14, ¶¶ 5, 10;  N.K. Decision at
4, ¶ 5; id. at  5 , ¶ 10

[12]     The district maintains that "Parents requested that the School District wait to have
a[n IEP] meeting until the private evaluation[s] . . . were completed."  Dkt. No. 21 at ECF p. 9.
A District special education liaison testified that she believed that parents had requested that
A.K.'s IEP meeting not be held until the independent evaluations were provided to the district.
Trans. Vol. 1A at 34:4-8.  However, Mr. Kirsch testified that he "recall[ed] generally the
understanding was [the District] wanted to wait as well.  I mean, I think it was a consensus of the
entire group that they wanted to have those in hand before they did the IEP.  I don't recall
specifically asking them to wait."  Trans. Vol. III at 486:12-18.

independent evaluator to discuss the expected completion date for the independent evaluation and the assessments administered to the twins.  A.K. Decision at 5, ¶ 17; N.K. Decision at 5, ¶ 17.  Also in early June, parents made arrangements to visit two autistic support kindergarten classrooms – one in the twins' neighborhood school and one at a school that the District's regional special education liaison had recommended in 2012.  A.K. Decision at 5, ¶ 16; N.K. Decision at 5, ¶ 16.  A June 10 email discussion was followed on June 18 with the District's issuance of an invitation to a June 20 joint IEP team meeting for A.K. and N.K.  A.K. Decision at 6, ¶ 22; N.K. Decision at 6, ¶ 22.  Also on June 18, a parent emailed the independent school psychologist's report to the District, although the independent speech/language evaluation remained outstanding.[13]  A.K. Decision at 6, ¶ 18; N.K. Decision at 5, ¶ 18.

On June 20, 2013, the day of the scheduled IEP team meeting, the District issued a reevaluation report which included a description of the independent evaluation and its results along with a review of earlier evaluations.  A.K. Decision at 6, ¶ 19; N.K. Decision at 6, ¶ 19. As summarized by the Hearing Officer, the independent evaluator made the same recommendations for services/interventions in home and school settings for both A.K. and N.K.:

> (a) 4 hours/day [applied behavior analysis (ABA)] instruction (2.5 hours in school for focus and to augment language skills, 1.5 hours @ home for generalization of skills); (b) speech/language skills to include articulation and pragmatic language; (c) daily small group academic instruction with an integrated curriculum to provide opportunities for practicing expressive language skills; (d) daily inclusion opportunities within the context of a program designed specifically for children with [autism spectrum disorder], including strategic pairing with a friend/social buddy, to promote appropriate peer interactions and socially mediated learning; (e) assistive technology for communication needs, monitored by trained learning and speech specialists; (f) Extend School Year (ESY) to consolidate newly learned skills and minimize regression.

---

[13]     The speech evaluator was in a car accident, delaying her completion of the speech evaluation reports.  See P-93.

A.K. Decision at 9, ¶ 44; N.K. Decision at 9, ¶ 44.

The District contends that at the June 20 meeting "[p]arents . . . elected to spend the entire time allocated for the meeting reviewing an EI report drafted by [the independent evaluator] for N.K. in lieu of reviewing the School District's Reevaluation Report and IEP for N.K." Dkt. No. 21 at ECF p. 11.  It maintains that Kelly "Donahue told the School District's IEP team that she was a private psychologist and/or behavior therapist for the family and dominated the meeting."[14]  Id.  Parents contend that "Donahue's report included present educational levels, educational needs, a behavior intervention plan, current interventions and antecedent (prevention) strategies for all behaviors of concern, replacement behaviors, on task behaviors, consequences (reinforcement) for when Student performs the replacement behavior for all behaviors of concern, proposed IEP goals, conclusions and recommendations" and that the information she shared at the meeting was "precisely the type of information an IEP team should consider in preparing an educational program."  Dkt. No. 26 at ECF p. 9.

The Hearing Officer found that at the June 20 meeting, the IEP team began reviewing the draft IEP the District had prepared for N.K., but their review was not completed before the one hour and forty-five minute long meeting ended.  N.K. Decision at 6, ¶ 23.  N.K.'s draft IEP, created on June 20, 2013, identified measurable annual goals and short term objectives and benchmarks along with an itemization of specially designed instruction required to achieve the annual goals.  Ex. P-48 at 19-31.  The District proposed 600 minutes per IEP term of group speech/language therapy, and 2100 minutes/week of a District provided 1:1 assistant when in the regular education classroom.  Id. at 31.  Under the proposed IEP N.K. was to be provided with use of a communication device across all classroom environments.  Id. at 30.  Some instruction

---

[14]     Kelly Donohue, Ph.D. is ASUA's executive director.  See P-47.

was to be provided inside an autistic support classroom, but per the draft IEP, N.K. was to "be INSIDE the regular classroom 79-40% [sic] of the day." Id. at 34 (emphasis in original). N.K.'s draft IEP did not, however, identify the proposed location of the supplemental autistic support placement that was recommended for N.K. and no NOREP was issued for N.K. following the meeting. Id.

The IEP proposed for A.K. (which likewise did not identify a proposed location for the supplemental autistic support placement for A.K.) was not discussed at the June 20 meeting and no NOREP was issued for A.K. either. A.K. Decision at 6, ¶ 23.

After the June 20 meeting, the District's special education liaison contacted the special education supervisor, "advising her of the IEP meeting that day, the number of changes parents had requested to [N.K.'s] IEP and . . . inquir[ed] how to proceed during the summer." A.K. Decision at 7, ¶ 26; N.K. Decision at 7, ¶ 26. The parties did not reconvene the meeting the following day.[15] A.K. Decision at 6, ¶ 24; N.K. Decision at 6, ¶ 24.

The Hearing Officer concluded that the District does not conduct IEP meetings during the summer. A.K. Decision at 7, ¶ 25; N.K. Decision at 6, ¶ 25. She found, however, that "no one from the District informed Parents of that policy, prior or subsequent to the June 18th transmission of the independent psychological and speech/language evaluation reports." Id. She also found that the District's special education liaison informed parents that they could exchange IEP revision suggestions with the District via email during the summer. A.K. Decision at 7, ¶ 26; N.K. Decision at 7, ¶ 26. Indeed, in a September 11, 2013 email chain between District

---

[15]     The Hearing Officer found that "[i]nitially, the parties planned to reconvene the meeting the next day, but the meeting was not held. Mother offered to attend the meeting without Father, who was not available, if it would 'be detrimental' not to meet." A.K. Decision at 6, ¶ 24; N.K. Decision at 6, ¶ 24.

employees,[16] one wrote that the special education liaison "was supposed to be working on this IEP over the summer with the parents." Ex. P. 94 at 5.  On July 23, parents emailed the special education liaison to inquire about the process of working on IEPs for the twins but did not receive a response.  A.K. Decision at 7, ¶ 27; N.K. Decision at 7, ¶ 27.  On August 5, parents emailed the special education liaison again and contacted the District's Early Intervention coordinator.  A.K. Decision at 7, ¶¶ 27-28 N.K. Decision at 7, ¶¶ 27-28.  The special education liaison responded that she had changed positions, had informed other District staff about the incomplete IEPs, would follow up with other staff and they should expect to be contacted by the District's special education director.[17]  A.K. Decision at 7, ¶ 27; N.K. Decision at 7, ¶ 27.  The District's early intervention coordinator responded by telling parents she would contact the special education director about the incomplete IEPs.  A.K. Decision at 7, ¶ 28; N.K. Decision at 7, ¶ 28.

Although the District did not communicate with parents in July, 2013, sometime during that month the District's special education director identified an autistic support classroom with proximity to the twins' home school and space available for them.[18]  A.K. Decision at 7, ¶ 30; N.K. Decision at 7, ¶ 30.  The special education teacher for the District-identified autistic support classroom learned she would be teaching kindergarten students sometime during the week of August 19.  A.K. Decision at 8, ¶ 32; N.K. Decision at 7, ¶ 32.  Once the twins were assigned to

---

[16]     The subject line for the September 11, 2013 email chain reads:  "Possible Legal Case at" the elementary school the twins had been assigned to attend. Ex. P-94.

[17]     In the September 11 email chain, another District employee explained that "the [special education liaison] is no longer at the school [where she was in the Spring,] she transferred to Roxborough.  I never heard anything else about the twins since our meeting.  Truthfully, I thought maybe the parents considered private placement.  Now I see they are [assigned to another elementary school]."  Ex. P-94 at 4.

[18]     The identified classroom was unknown to the District's special education liaison at the time of the June 20 IEP meeting.  A.K. Decision at 7, ¶ 30; N.K. Decision at 7, ¶ 30.

her, she called parents to set up a kindergarten interview prior to the start of the school year, unaware that the twins did not have IEPs in place.  A.K. Decision at 8, ¶¶ 34, 36; N.K. Decision at 8, ¶¶ 34, 36.

On August 20, 2013, parents delivered a letter to the District which notified the District that, within ten-days, they would enroll the twins in a private school to assure they would have an appropriate placement at the beginning of the school year[19] and they would seek tuition reimbursement.  A.K. Decision at 7, ¶ 29; N.K. Decision at 7, ¶ 29.  The letter also noted parents' willingness to continue with the IEP process.  Id.

After receiving parents' August 20 notice of private school placement, and knowing that IEPs had not been finalized for the twins, the District's special education director instructed the team at the twins' assigned school that when the school reopened for the new school year, they should "get right back on it to make sure [the District was] able to "deliver a program" to the twins.  A.K. Decision at 7, ¶ 31; N.K. Decision at 7, ¶ 31.

On August 30, 2013, a parent sent a letter to the District's special education director and requested that the early intervention IEPs continue to be implemented until they could meet with the District and reach an agreement on new IEPs.  Dkt. No. 21 at ECF p. 14, citing Ex. P-42.  He wrote,

> [y]ou left a message on my office voicemail . . . on August 21, 2013 regarding the District's proposed placement for [A.K.] and [N.K.], and asked me to call you to discuss.  I've called a number of times over the past week and a half starting on the 21st . . . . Your voicemail message indicated you were on vacation from August 19 through August 28 – are you back?

Ex. P-42.  He explained that "[w]e very much want to discuss our [twins'] placement with you,

---

[19]     In 2013, September 19 was the official first day of school for kindergartners in the Philadelphia School District.  Ex. P-86.

as the school year is upon us and we want to request that the [early intervention] program continue until a new IEP is developed." Id.  Parents contend that they "requested that the [early intervention] IEPs be implemented pending completion of an offer of FAPE for A.K. and N.K." and that "no one told Parents that the District *would* implement the [early intervention] IEP." Dkt. No. 26 at ECF p. 12 (emphasis in original).  The District asserts that "[n]otwithstanding[ ] the status of the proposed IEPs at the start of the 2013-14 school year, it is undisputed that the School District would have continued to implement the [early intervention] IEPs until the parties could reach an agreement and/or finalize the IEPs."  Dkt. No. 21 at ECF p. 37.

Before the District reconvened IEP meetings for the twins, on Tuesday, September 3, 2015, parents, Donahue and Mary Beth Harmer (an ASUA teacher) attended an IEP meeting at ASUA for A.K. and N.K..  Id. at ECF p. 14, citing Ex. SD-19, N.T. 57-61 (Volume III A). ASUA's speech and occupational therapy providers did not attend the meeting.  Dkt. No. 21 at ECF p. 14, citing N.T. 1508 and N.T. 116-117 (Vol. V A).

ASUA is a school "founded by [A.K. and N.K.'s] mother" but is "registered as a non-profit corporation with a governing board of directors.  Parents pay tuition for Student[s] and derive no financial compensation from the school."  A.K. Decision at 14, ¶ 77; N.K. Decision at 14, ¶ 77.  At the administrative hearing, A.K. and N.K.'s mother testified that she began working on creating ASUA – her "dream school" for the twins in January, 2013.  Trans. 1760.  ASUA was established as a legal entity on April 15, 2013.  Dkt. No. 21 at ECF p. 9.  "Parents . . . applied to the Pennsylvania Department of Education for a license for ASUA  about 1 month prior to the June, 2013 IEP meeting."  Id.

ASUA "provides individual and small group instruction and behavior support based on ABA principles, along with academic instruction, individual and group speech/language therapy

and [occupational therapy] services in accordance with an IEP." A.K. Decision at 14, ¶ 78; N.K.

Decision at 14, ¶ 78. Included in ASUA's tuition are "one 30 minute individual and three 30

minute group sessions of speech/language therapy each week, as well as one 30 minute

individual session of OT and three 30 minute group sessions of OT." A.K. Decision at 14, ¶ 79;

N.K. Decision at 14, ¶ 79. At the time of the administrative decision, parents, at a cost beyond

ASUA's tuition, also provided A.K. and N.K. with "an additional 150 minutes/week of

individual speech therapy and an additional 30 minute session of individual OT each week" and

with "[a] 1:1 instructional aide . . . ." A.K. Decision at 15, ¶ 80; N.K. Decision at 14, ¶ 80.

     The proposed ASUA IEPs for A.K. and N.K., dated September 4, 2013, set forth

measurable annual goals and short term objectives for the twins and identified program

modifications and specially designed instruction including "one to one instruction on all new

skills based on the principles of Applied Behavior Analysis . . . ." and "1:1 support throughout

the school day," (i.e., "5 days per week/6 hours per day"). Civ. A. 14-4910, Ex. SD-19 at 37, 39;

Civ. A. 14-4911, Ex. SD-19 at 39, 41. Other services to be provided to A.K. and N.K. included

45 minutes of individual speech therapy 4 times a week, 30 minutes of group speech therapy

three times a week, 60 minutes of individual occupational therapy per week, and 30 minutes of

group occupational therapy per week. Civ. A. 14-4910, Ex. SD-19 at 43; Civ. A. 14-4911, Ex.

SD-19 at 40-41. The proposed ASUA IEPs for A.K. and N.K. did not include a positive

behavioral support plan, however, and instead explained that "[a functional behavioral analysis]

will be conducted within the first 45 days of school and a [positive behavioral support plan] will

be added to the IEP." Civ. A. 14-4910 and Civ. A. 14-4911, Ex. SD-19 at 5.

     On September 5, 2013, after the ASUA IEP meeting, parents received letters signed by

Donahue as "Executive Director" of ASUA informing them of the twins' acceptance into the

school.  Ex. P-44 and Ex. P-45.  On September 6, 2013 parents signed "irrevocable tuition

contract[s]" for A.K. and N.K.'s enrollment at ASUA.  A.K. Decision at 14, ¶ 76; N.K. Decision

at 14, ¶ 76; see also P-47.  After the twins' enrollment at ASUA, the school conducted functional

behavior assessments and implemented behavior plans for A.K. and N.K. "based on the [early

intervention] behavior plan while staff collected data to update them."  Dkt. No. 26 at ECF p. 12.

     On September 11, parents, without the twins[20] and accompanied by the psychologist who

served as the twins' behavior specialist, attended the kindergarten "interview" at the District's

designated elementary school.  A.K. Decision at 8, ¶ 36; N.K. Decision at 8, ¶ 36.  Before the

end of the meeting, the autistic support teacher and the new special education liaison located the

IEP proposals and NOREPs for the twins from June and gave copies to parents.  A.K. Decision

at 8, ¶ 38; N.K. Decision at 8, ¶ 38.  The teacher asked parents to call her the next day after

reviewing the documents to let her know whether they agreed or disagreed with the IEPs.  A.K.

Decision at 8, ¶ 38; N.K. Decision at 8, ¶ 38.  She also offered to schedule IEP meetings in the

days remaining before the school year began.  A.K. Decision at 9, ¶ 38; N.K. Decision at 8, ¶ 38.

     In the September 11 email chain between District employees referenced above, a District

speech language pathologist wrote that "there is no finalized IEP in Easy Systems" and explained

that the assigned elementary school "is trying to figure out who is completing the IEP . . . .  Even

as soon as next week!  Is there any way I can get some back up for this case?"  Ex. P. 94 at 5.  In

a September 13 email describing her September 11 meeting with Parents, the District's autistic

support teacher wrote:  "parents have some concerns regarding not getting enough speech and

OT.  In addition, [parents] were concerned "as well as [the District special education liaison] and

I were concerned, with the fact that [the elementary school involved in the Spring IEP

---

[20]    Students are generally expected to attend the kindergarten interview with their
parents.  A.K. Decision at 8, ¶ 34; N.K. Decision at 8, ¶ 34.

proceedings] did not hold IEP meetings and finalize documents." Ex. P-92.

The autism support classroom to which the District had assigned A.K. and N.K. for the 2013-14 school year had a roster of 11 students including the twins. A.K. Decision at 10, ¶ 46; N.K. Decision at 13, ¶ 70. The Hearing Officer explained that "[t]wo of the children assigned to the teacher's caseload [were] fully included in regular kindergarten classes, and three other children spend part of the day in 1st grade regular education settings." Id. She found that the autism support classroom "is guided by the STAR program, which is based upon ABA principles embedded in the curriculum and use of ABA-based interventions such as discrete trial training and pivotal response training." A.K. Decision at 10, ¶ 47; N.K. Decision at 10, ¶ 47. The autism support classroom teacher "received 10-15 days of training" with respect to the STAR program, "and was regularly (once a week) observed and coached during the first two years of delivering the program, to assure that she was implementing it properly." A.K. Decision at 10, ¶ 49; N.K. Decision at 10, ¶ 49. The Hearing Officer wrote that,

> [a]fter reviewing the recommendations of Parents' independent evaluator from the spring of 2013, the [autism support] teacher concluded that her classroom generally meets the independent evaluator's recommendations for class size, small group instruction, ABA discrete trial training, opportunities for expressive language practice and inclusion, speech/language intervention directed toward articulation, pragmatic language skills, requesting, and expressing needs and assistive technology.

A.K. Decision at 12, ¶ 58; N.K. Decision at 12, ¶ 58.

On September 15, 2013, nine days after entering into irrevocable ASUA tuition agreements for the twins, parents disapproved the District's recommended kindergarten classroom placements and returned to the District signed NOREPs along with a letter describing their concerns about the proposed IEPs. A.K. Decision at 9, ¶ 38; N.K. Decision at 8, ¶ 38.

With the twins already enrolled at ASUA, and after parents rejected the District's

proposed placement for the twins, the District's Special Education Director wrote to parents on September 26, 2013 that she had "reviewed [their] letters raising issues of concern" and noted that the District's "records reflect signed NOREPs and IEPs for both children . . . ."  Ex. P.-53. The letter attached an invitation for Parents to attend IEP meetings for A.K. and N.K. on October 9, 2013.  A.K. Decision at 12, ¶ 64; N.K. Decision at 12, ¶ 64.  The District also sent PTREs for permission to review the twins' records from non-District sources to which parents consented. Id.

On October 4, 2013, parents responded to the District's September 26 letter explaining that they were "unclear as to which documents" the District was when it said that District records reflected "signed NOREPs and IEPs for both children" because, among other things, "[a]s to IEPs, we were not presented with final IEPs for either [child] on either June 20, 2013 or September 11, 2013, and we did not sign an IEP for either [child] at either meeting."  Ex. P-55. Parents also explained that on September 15, they "signed and indicated [they] rejected" "the NOREPs for both [children which they] received on September 11, 2013, though the documents both bear the dates of June 20, 2013 . . . ."  Id.

At the October 9, 2013 IEP meetings, which parents attended, the District proposed IEPs that included ten annual goals for N.K. and twelve annual goals for A.K.  A.K. Decision at 12, ¶ 65; N.K. Decision at 12, ¶ 65.  The Hearing Officer concluded that "[t]he annual goals reflect the curriculum and services provided in the [autism support] classroom proposed for Student[s], as well as information the [autism support] teacher gathered from documents since she had not had the opportunity to personally observe and assess Student[s]."  A.K. Decision at 12-13, ¶ 65; N.K. Decision at 12-13, ¶ 65.  For N.K., "[t]he October 9 IEP proposal provided for a 1:1 aide for the entire school day, and offered 600 minutes of group pull-out speech/language services per

annual IEP term." N.K. Decision at 13, ¶ 66. For A.K., the IEP proposal also provided for a 1:1 aide for the entire school day and 600 minutes of pull-out speech/language services per annual IEP term, but did not specify whether the speech services would be individual or group. A.K. Decision at 13, ¶ 66. Neither proposed IEP provided for occupational therapy. A.K. Decision at 13, ¶ 66; N.K. Decision at 13, ¶ 66. The proposed IEPs "also offered [extended school year services] for the summer of 2014 for 20 hours/week over 8 weeks in July and August . . . ." A.K. Decision at 13, ¶ 67; N.K. Decision at 13, ¶ 67.

At the October 9 meeting, parents consented to additional "reviews and assessments, including assistive technology and OT evaluations . . ." which "were completed in November 2013." A.K. Decision at 13, ¶ 64; N.K. Decision at 13, ¶ 64. On October 22, parents attended another round of IEP meetings and were given draft IEPs that had been updated based on discussions and parent requests for changes at the October 9 meeting. A.K. Decision at 13, ¶ 69; N.K. Decision at 13, ¶ 69. The Hearing Officer found that the revised IEPs were "not substantially different from the October 9 draft[s]." Id.

The District made final IEP offers dated December 13, 2013. A.K. Decision at 13, ¶ 70; N.K. Decision at 13, ¶ 70. The District had proposed further IEP meetings on that day, but, because parents were unable to meet in December, the District sent the IEPs to parents. Id. Parents provided written responses. Id. The Hearing Officer found that parents'

> primary concerns [with the IEP offered by the District in December 2013] were with the level of ABA services, including lack of a home-based ABA program; lack of consistent access to a [Board Certified Behavior Analyst] which Parents contend is necessary to provide appropriate supervision for an intensive behavioral program; insufficient staff training; insufficient speech/language services overall, with no provision for individual services and a speech/language goal that underestimates [each twin's] ability; insufficient OT services, no offer of OT during [extended school year]; no goal addressing sensory needs;

> insufficient/non-specific social skills intervention program; lack of
> positive behavior support plan.

A.K. Decision at 13, ¶ 71; N.K. Decision at 13, ¶ 71.  She explained that parents raised a concern

about noise levels and concomitant distraction in the autism support classroom.  A.K. Decision at

13, ¶ 72; N.K. Decision at 13, ¶ 72.  Parents were also dissatisfied because the proposed IEPs

made "no reference to intensive 1:1 instruction for four hours each school day, which Parents

believe [both A.K. and N.K.] need[ ] . . . ."  A.K. Decision at 14, ¶ 72; N.K. Decision at 13, ¶ 72.

Parents also "objected to placement within the regular education classroom for 40-79% [sic] of

the school day . . . ."[21]  A.K. Decision at 14, ¶ 72; N.K. Decision at 13-14, ¶ 72.

## III.    The Hearing Officer's Decisions

In her July 2 and July 3, 2014 decisions, the Hearing Officer found that the District had

not offered an appropriate IEP to either twin prior to December 2013.[22]  With respect to both

A.K. and N.K. she explained that

> not only did the District fail to complete an IEP for a
> Student severely affected by [autism spectrum disorder]
> who was transitioning into the District from [early
> intervention], District staff unilaterally selected a
> placement and school location, but not until August 2013,
> and did not notify the teacher to whose classroom Student
> was to be assigned that there was no completed IEP.

A.K. Decision at 18, N.K. Decision at 18.  She found that parents had been denied "a meaningful

right to participate in placement decisions for the twins."  Id.  She wrote that

---

[21]     With respect to this concern, the Hearing Officer found that the District's "latest"
IEP offers placed A.K. outside of the special education classroom for 27% of the day and N.K.
outside of the special education classroom for 29% of the day.  A.K. Decision at 14, ¶ 73; N.K.
Decision at 14, ¶ 73.

[22]     With respect to A.K., she concluded that the School District "did not offer an
appropriate IEP – indeed, any IEP at the beginning of the 2013-14 school year . . . ."  A.K.
Decision at 24.  With respect to N.K., she concluded that the School District "did not offer an
appropriate IEP – indeed, any fully developed IEP, at the beginning of the 2013-14 school
year . . . ."  N.K. Decision at 24.

> However effective the teacher may be at delivering instruction in accordance with the STAR program the district has adopted for the classroom to which student was assigned, an effective teacher and program does not relieve the District of the obligation to assure an appropriate IEP, a meaningful opportunity for Parent to participate in placement and program decisions, and to have an IEP in place at the beginning of the school year.

A.K. Decision at 18-19, N.K. Decision at 18.

The Hearing Officer considered the District's argument "that Parents' actions in seeking a public school placement while attempting to start [ASUA] were so pervasively inequitable as to relieve the District of all obligations to [A.K. and N.K.] from the time Parents contacted the District in the winter of 2013." A.K. Decision at 20; N.K. Decision at 20. She concluded that

> [t]he record establishe[d] no equitable basis for denying or reducing tuition reimbursement based on Parents' actions between February 2013, when they contacted the District to begin the process of developing a kindergarten program for [A.K. and N.K.] and June 20, 2013, when the parties met for an IEP meeting . . . or through the date in August 2013 when Parents were finally notified of [A.K.'s and N.K.'s] classroom assignment[s].

A.K. Decision at 22; N.K. Decision at 22. She found that "there was no evidence that Parents were committed to sending [A.K. or N.K.] to the private school between February and June 2013, when parents first contacted the District;" that parents could not have been certain that they would succeed in establishing or licensing ASUA by the beginning of the 2013-14 school year; and that "[t]he overall circumstances here were not substantively different from the usual situation of dissatisfied, or potentially dissatisfied, parents exploring private placements." A.K. Decision at 21-22, N.K. Decision at 21-22.

The Hearing Officer also determined that parents' private placement of A.K. and N.K. at ASUA met the criteria for an appropriate placement. A.K. Decision at 20; N.K. Decision at 20. As support for her conclusion, she explained that "the record establishes that the program

provided by the private school is similar to the District program."  A.K. Decision at 20, N.K. Decision at 20.

The Hearing Officer thus ordered the District to reimburse defendants for the basic costs of tuition and transportation for A.K. and N.K.'s attendance at a private school from September to December 2013.  A.K. Decision at 24; N.K. Decision at 24.  She found, however, that there was "insufficient evidence . . . to support [A.K.'s or N.K.'s] need for occupational and speech/language therapies beyond the services included in the basic tuition for the private school program, or for home-based ABA therapy in order for [A.K. or N.K.] to make appropriate educational progress . . . ."  A.K. Decision at 24; N.K. Decision at 24.  She also noted that

> if [A.K. or N.K.] needed a 1:1 aide in order to make meaningful progress, that was a service that should have been provided by the private school program.  Had an aide been required to meet [A.K.'s or N.K.'s] educational needs, but not provided, the private school would have been inappropriate.  It is not the District's responsibility to pay extra costs that Parents had to incur to make the private school appropriate.

Id.

As of December 2013 the Hearing Officer found that parents no longer met the first criterion for tuition reimbursement, because "the District offered an appropriate IEP" and "Parents did not present sufficient persuasive evidence that [A.K. and N.K.] cannot make meaningful progress without the level and type of services [parents] requested."  A.K. Decision at 19, 24; N.K. Decision at 19, 24.  She found that even though the speech/language and occupational therapy services offered by the District were "minimal and are based on the District's model of services, not on a reasoned consideration of Student's needs[, t]he insufficiency of the related services . . . does not make the entire IEP inappropriate."  A.K. Decision at 19, N.K. Decision at 19.

## IV.    IEP for the 2014-15 School Year

Parents have also asserted counterclaims seeking tuition reimbursement for A.K. and N.K. for the 2014-15 school year.  See Civ. A. 14-4910, Dkt. No. 3 at ¶ 95; Civ. A. 14-4911, Dkt. No. 3 at ¶ 95.  The District offered IEPs to A.K. and N.K. for the 2014-15 school year on June 10, 2014.  Civ. A. 14-4910 and Civ. A. 14-4911, Dkt. No. 12-1.  On June 19, 2014, the District sent parents NOREPs for the twins proposing to place them in the same autistic support classroom with small groups that the District had proposed for the 2013-14 school year.  Civ. A. 14-4910 and Civ. A. 14-4911, Dkt. No. 12-2 at 3.  The District contends that, although the IEP it offered in June 2014 was "for the same program and placement . . . , many of the goals/baselines were updated."  Dkt. No. 28 at ECF p. 3.

On June 30, 2014, parents rejected the proposed IEPs, citing as concerns:  (1) the level of ABA and one-on-one teaching, (2) the absence of home-based ABA programming; (3) the absence of support or consultation from a BCBA; (4) the absence of a provision for a trained one-on-one assistant for each twin; (5) the provision of an insufficient amount of speech and language therapy; and (6) the failure to provide any occupational therapy or consultation; (7) an absence of a plan for "socially mediated learning"; (8) no proposal for augmentative communication; (9) no kindergarten level goals; (10) a vague and inaccurate positive behavior support plan; (11) a distracting school environment; and (12) excessive class size.  See Civ. A. No. 14-4910, Dkt. No. 12-3; Civ. A. No. 14-4911, Dkt. No. 12-3; see also Dkt. No. 22 at ECF p. 23-31.  The District responded to parents on July 7, 2014, expressing willingness to discuss parents' June 30, 2014 correspondence.  Dkt. No. 22 at ECF p. 31.  Parents contend that the District did not, however "attempt to schedule [an IEP] meeting nor issue an Invitation to Participate, the formal notice required before an IEP meeting may be convened."  Id.  Parents requested a due process hearing, see Dkt. No. 12-2 at ECF p. 4, but did not file separate due

process complaints for either of the twins with respect to the 2014-15 school year.  See Dkt. No. 20 at ECF p. 9.

In its answers to parents' counterclaims, the District alleges that after the June 2014 IEP meeting, "Parents then sent the School District a notice of their intent to seek tuition for the 2014-2015 school year" and the District denied parents' request.  Civ. A. No. 14-4910, Dkt. No. 9 at ¶ 12; Civ. A. No. 14-4911, Dkt. No. 8 at ¶ 12; see also Dkt. No. 12-3 at ECF p. 13; Dkt. No. 12-4.  The District's answers to parents' counterclaims allege that "Parents then sent correspondence to the School District in July of 2014, stating that they were withdrawing the request for tuition for the 2014-2015 school year."[23]  Id.  However, in parents' counterclaims, they seek "reimbursement for tuition, transportation, and related services necessary for A.K. [and N.K.] to receive FAPE in addition to the basic tuition" for the 2014-15 school year.  Civ. A. No. 14-4910, Dkt. No. 3 at ¶ 95; Civ. A. No. 14-4911, Dkt. No. 2 at ¶ 95.

On August 18, 2014, parents executed an irrevocable tuition contract with ASUA for A.K. and for N.K.  Id.  Thereafter, ASUA issued an IEP for A.K. on September 18, 2014 and for N.K. on September 22, 2014.  Id.

## DISCUSSION

**I.      Cross-Motions for Judgment on the Administrative Record**

**A.      Standard of Review**

This Court has jurisdiction to review the decision of a state hearing officer under 20 U.S.C. § 1415(i).  When a district court reviews state administrative proceedings regarding IDEA claims, the applicable standard is "modified de novo review."  Ridley Sch. Dist. v. M.R., 680 F.3d 260, 268 (3d Cir. 2012).  District courts are required to give "due weight" to the factual

---

[23]      A copy of the referenced correspondence, however, does not appear to be in the record before the Court.

findings of the Hearing Officer in IDEA cases.  Id. at 269.  "Factual findings from the administrative proceedings are to be considered prima facie correct."  Id. (citation and internal quotation omitted).  But according "due weight" to the Hearing Officer's findings means that the district court has an obligation "to consider – although not necessarily to accept – the administrative fact findings."  Carlisle Area Sc. Dist. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995).  "If a reviewing court fails to adhere to [the factual findings of the administrative proceeding], it is obliged to explain why."  S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003), quoting M.M. v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 531 (4th Cir. 2002) (citations omitted).  If the court does not hear additional evidence, it must find support in the administrative record for any factual conclusions different from those of the Hearing Officer by pointing to the "contrary nontestimonial extrinsic evidence."  Id.  "[W]here the District Court hears additional evidence it is 'free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of [IDEA].'"  S.H., 336 F.3d at 270, quoting Oberti v. Bd. of Ed. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1220 (3d Cir. 1993).  Within the confines of these standards, the district court's findings must be based on the preponderance of the evidence.  D.S. v. Bayonne Bd. of Ed., 602 F.3d 553, 564 (3d Cir. 2010); Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 758 (3d Cir. 1995).  "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged."  Ridley Sch. Dist., 680 F.3d at 270.

### B.    2013-14 School Year

Both the District and parents challenge the Hearing Officer's decisions with respect to whether A.K. and/or N.K. were entitled to an award of tuition reimbursement for the 2013-14

school year and, if so, in what amount.  "Parents are entitled to tuition reimbursement under the IDEA for unilaterally changing their child's placement to a private school if the following three elements are proven:  (1) the District failed to offer the student a FAPE; (2) the private placement is appropriate; and (3) equitable considerations favor reimbursement."  Lauren G. ex. Rel. Scott G. v. W. Chester Area Sch. Dist., 906 F. Supp. 2d 375, 390 (E.D. Pa. 2012) (citations omitted).

### 1.    FAPE

First I must consider whether the District has met its burden to show that it did not deny A.K. and/or N.K. a free appropriate public education by failing to finalize their IEPs by the beginning of the school year.  Under IDEA, a state "must confer an education providing 'significant learning' and 'meaningful benefit' to the child."  D.S., 602 F.3d at 556 (citation omitted).  "IDEA contemplates that school districts will achieve these goals by designing and administering a program of individualized instruction for each special education student set forth in an [IEP.]"  Id. at 557, citing 20 U.S.C. §§ 1412(a)(4), 1414(d).  The "IEP must provide the student with a basic floor of opportunity," however, "it need not necessarily provide the optimal level of services that parents might desire for their child."  D.S., 602 F.3d at 557 (citation and internal quotations omitted).  Substantively, an IEP must be "reasonably calculated to enable the child to receive educational benefits."  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 206-07 (1982).

Additionally, "IDEA sets out a variety of procedures to be followed in the creation of the IEP."  C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 65-66 (3d Cir. 2010).  "The premise of the IDEA is that parents and schools *working together* to design an IEP is the ideal way to reach the statute's goal of a FAPE for every child."  M.R. v. Ridley Sch. Dist., 744 F.3d 112, 117 (3d Cir.

2014) (emphasis added).  Importantly here, the statute requires that "[a]t the beginning of each school year, each local educational agency, State educational agency, or other State agency, as the case may be, shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program, as defined in paragraph (1)(A)."  20 U.S.C. § 1414(d)(2)(A).

"[A] school district's failure to comply with the procedural requirements of the [IDEA] will constitute a denial of a FAPE . . . if such violation causes substantive harm to the child or his parents."  C.H., 606 F.3d at 66.  Substantive harm occurs when a party can establish, by a preponderance of the evidence, that "the procedural inadequacies (i) [i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit."  Id. at 67, quoting 34 C.F.R. § 300.513(a)(2) (alteration in original).  Procedural violations of IDEA, particularly in relation to an IEP, typically only justify prospective injunctive relief, not compensatory relief or tuition reimbursement.  C.H., 606 F.3d at 66.

The Hearing Officer concluded that "[t]he District's actions in not completing an IEP, unilaterally and belatedly deciding on a placement, school and classroom location made it impossible for Parents to determine whether the placement and services to be provided would meet [A.K.'s or N.K's] needs."  A.K. Decision at 18; N.K. Decision at 18.  She found that "Parents met the first criterion for tuition reimbursement, at least until the District's offer of an IEP and NOREP in December 2013" because, for A.K., "the District did not offer . . . any IEP at the beginning of the 2013-14 school year," and for N.K., "the District did not offer . . . any fully developed IEP[ ] at the beginning of the 2013/14 school year . . . ."  A.K. Decision at 19; N.K.

Decision at 19.

Seeking to overturn the Hearing Officer's decisions with respect to tuition reimbursement for September to December 2013, the District contends that "there were no procedural violations and/or 'timeline' issues in this matter due to any fault on the part of the school district." Dkt. No. 21 at ECF p. 37. It asserts that "[n]otwithstanding[ ] the status of the proposed IEPs at the start of the 2013-14 school year, it is undisputed that the School District would have continued to implement the [early intervention] IEPs until the parties could reach an agreement and/or finalize the IEPs." Id. It argues that "[t]he lack of a 'finalized IEP by the start of the school year is a direct result of Parents' refusal to review the draft IEP at the June 2013 meeting and/or not responding to the School District's efforts to set up another IEP meeting." Id. at ECF p. 36.

Parents counter that "[t]he failure to propose a program prior to the beginning of the school year is a fatal procedural violation because it deprives the parents of any opportunity whatsoever in the educational planning process." Dkt. No. 22 at ECF p. 34-35. Parents argue that "[a]t a minimum, to make an informed decision, parents have to know the physical location of their student's program." Id. at ECF p. 36. They argue that they "were never presented with a final IEP to which they could provide consent before the initial provision of special education." Id. at ECF p. 38.

I find that the District has not met its burden to reverse the Hearing Officer's decisions to award tuition reimbursement to A.K. and N.K. for September to December 2013. IDEA's implementing regulations provide that "[a]t the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP . . . ." 34 C.F.R. § 300.323(a). It is undisputed that was no finalized IEP in place for either A.K. or N.K. at the beginning of the school year. But this is not the end of the analysis, as the Court of

Appeals for the Third Circuit has "decline[d] to hold as a matter of law that any specific period of time without an IEP is a denial of a FAPE in the absence of specific evidence of an educational deprivation." C.H., 606 F.3d at 69.

The District argues that its June 2013 offer of IEPs "for a supplemental [autism support] program at the School District with the related services of speech and language therapy, school based counseling, a 1-1 assistant and occupational therapy" was legally sufficient to constitute an offer of FAPE. Dkt. No. 21 at ECF p. 38. It contends that "IDEA does not expressly require any particular level of detail in an IEP" and that "a lack of detail is contemplated" by Pennsylvania's regulations which "only require the IEP to list the 'types of support to be provided . . . .'" Id., citing 34 C.F.R. 300.320(a)(1) and 22 Pa. Code 14131(a)(1). I disagree.

IDEA provides that an IEP must state "the projected date for the beginning of the services and modifications . . . , and the anticipated frequency, *location*, and duration of those services and modifications." 20 U.S.C.A. § 1414(d)(1)(A)(i)(VII) (emphasis added). "As a general matter, the location of the services is not conclusive in determining what constitutes the educational placement of the student. However, location cannot be entirely divorced from the inquiry." P.V. ex rel. Valentin v. Sch. Dist. of Phila., No. 11- 04027, 2013 WL 618540, at *6 (E.D. Pa. Feb. 19, 2013) (internal quotation marks and alteration omitted), quoting George A. v. Wallingford Swarthmore Sch. Dist., 655 F. Supp. 2d 546, 550 (E.D. Pa. Sep. 3, 2009). "[A]n IEP's failure to identify a specific school location will not constitute a per se procedural violation of the IDEA." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 420 (2d Cir. 2009). But, "[b]ecause the procedural protections in the IDEA are intended to ensure substantive outcomes,. . . it follows that parents have a procedural right to evaluate the school assignment, i.e., the right to acquire relevant and timely information as to the proposed school." C.U. v. N.Y.C. Dep't of

Educ., 23 F. Supp. 3d 210, 227 (S.D.N.Y. 2014), citing Rowley, 458 U.S. at 206.

The Hearing Officer explained that regardless of whether the District's proposed classroom teacher was effective "at delivering instruction in accordance with the STAR program the District has adopted for the classroom to which [the twins were] assigned, an effective teacher and program does not relieve the District of the obligation to assure an appropriate, IEP, a meaningful opportunity for Parent to participate in placement and program decisions, and to have an IEP in place at the beginning of the school year."  A.K. Decision at 18; N.K. Decision at 18.  The Hearing Officer's decisions correctly find that under the circumstances of these actions, "the identity of the school and its resources are relevant to the FAPE determination" and that the IEPs proposed for the twins in June left parents without sufficient information to assess their substantive adequacy, i.e. whether the program proposed by the District could "be reasonably expected to satisfy [each] child's IEP."  C.U., 23 F. Supp. 3d at 229.  As one of my colleagues has previously explained, "under the IDEA, the School District cannot categorically deny parents the opportunity to provide input and receive notice about the educational placement of their autistic child."  P.V. ex rel. Valentin, 2013 WL 618540, at *8.[24]  On the record before me, parents were only informed of the details surrounding the proposed location for the twins' kindergarten placement sometime during the week of August 19th, with less a month remaining until the scheduled September 19th start of school.  As late as September 11, the District was "still trying to figure out who is completing the IEP[s]."  Ex. P. 94 at 5.  Here, as in C.U., "[p]arents had at least a procedural right to inquire whether the proposed school location had the

---

[24]     The District cannot rely on the fact that the twins' early intervention IEPs would have remained in place pending finalization of the school year IEPs, see Dkt. No. 25 at ECF p. 15, to remedy its having impeded parents' opportunity to have a meaningful opportunity for participation in the decision-making process regarding the provision of a FAPE to the twins prior to the start of the 2013-14 school year.

resources set forth in the IEP." C.U., 23 F. Supp. 3d at 227; cf. A.K. ex rel. J.K. v. Alexandria City Sch. Bd., 484 F.3d 672, 682 (4th Cir. 2007) ("in a case in which the parents express doubt concerning the existence of a particular school that can satisfactorily provide the level of services that the IEP describes, the IEP must identify such a school to offer a FAPE").  In this case, the District failed to provide parents with important details regarding the proposed classroom for the twins (including details about the "highly structured" classroom environment" or "specialized curriculum" referenced in the draft IEPs, see, e.g. Ex. P.-48 at 19, 25, 27) until just before the start of the school year and thus "significantly impeded [parents'] opportunity to participate in the decision-making process regarding the provision of a FAPE to the" twins.  34 C.F.R. § 300.513(a)(2).

### 2.    ASUA as a Proper Private Placement

Next, I consider whether the District has met its burden to show that "the Hearing Officer erred in finding that [ASUA] is appropriate for A.K. and N.K."  Dkt. No. 21 at 40.  "A private placement is proper if it (1) is appropriate, i.e., it provides significant learning and confers meaningful benefit, and (2) is provided in the least restrictive appropriate educational environment."  Lauren W. v. DeFlaminis, 480 F.3d 259, 276 (3d Cir. 2007) (citation, internal quotations and alteration omitted).  A private placement is appropriate if "it provides 'significant learning' and confers 'meaningful benefit.'"  Lauren W., 480 F.3d at 276.  But "the standard a [private] placement must meet in order to be 'proper' is less strict than the standard used to evaluate whether a school district's IEP and placement are appropriate."  West-Windsor-Plainsboro Reg'l Sch. Dist. Bd. of Educ. v. M.F. ex rel. A.F., No. 09-4326, 2011 WL 835609, at *12 (D.N.J., Mar. 4, 2011), citing Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter, 510 U.S. 7, at 12-13 (1993).

Parents argue that "A.K. and N.K. received appropriate services and continued to make progress in reaching their academic, social, and behavioral goals" at ASUA and that "ASUA provides an intensive, individualized program appropriate for each [child's] needs." Dkt. No. 26 at ECF p. 31. The District criticizes the ASUA IEPs and ASUA's implementation of the IEPs for not completing a functional behavioral assessment "for months." Dkt. No. 21 at ECF p. 41. Parents contend that, pending the outcome of the functional behavior assessment, ASUA implemented "the very [early intervention] program that the District now somehow claims it 'would have' implemented, notwithstanding the fact that no one ever told Parents that the school district would implement the [early intervention] IEPs at the time of transition." Dkt. No. 26 at ECF p. 12. Parents thus argue that "[t]he District acknowledges that continuation of the [early intervention] behavior plan was appropriate." Id. at ECF p. 12 n.4, citing Dkt. No. 21 at 10 ("District also would have continued to implement the behavior plan from [early intervention] until the [functional behavioral assessment] data was collected.").[25]

"IDEA's only mention of the functional behavioral assessment method is in § 1415(k)(1)(D), which requires use of that technique when a disabled student, who is already being educated pursuant to an IEP, continues to exhibit behavioral problems. This neither precludes nor requires use of a functional behavioral assessment in" ASUA's initial IEPs. D.K. v. Abington Sch. Dist., 696 F.3d 233, 251 (3d Cir. 2012), citing 20 U.S.C. § 1414(b)(2)(A)-(C); 34 C.F.R. § 300.304(b)(1)-(3). Given that "[p]rivate placements are not subject to the same statutory standard for providing a FAPE as are public school agencies," Coleman v. Pottstown Sch. Dist., 983 F. Supp. 2d 543, 568 (E.D. Pa. 2013), aff'd in part, 581 F. App'x 141 (3d Cir.

---

[25]   Indeed, the Hearing Officer found that "the record establishes that the program provided by the private school is similar to the District program." A.K. Decision at 20; N.K. Decision at 20.

2014), I find that the District has not shown that ASUA was rendered an inappropriate private placement by any delay in ASUA's completion of functional behavioral assessments for the twins.  This is particularly the case where ASUA it implemented the early intervention IEPs pending the outcome of the functional behavioral assessments.

The District also maintains that ASUA is not a proper private placement because "ASUA admitted that it is not providing appropriate inclusion opportunities to A.K. and N.K."  Dkt. No. 21 at 40.  Daily reports from ASUA generally "did not have any information regarding inclusion as the 'notes from inclusion time' sections were blank."  Id. at ECF p. 16.  According to the District, opportunities for inclusion provided at ASUA involved non-academic interactions with fifth grade children who "may or may not be special education students" and a trip to a nature center with children who "may or may not be special education students."  Id. at ECF p. 16. The District questions whether the ASUA IEP's objectives for goals involving groups of children could be met when "ASUA only had two students by the start of the school year (A.K. and N.K.)" and when "Donahue admitted that ASUA often uses adult staff as part of the 'group' instead of children as the goal requires."  Id. at ECF p. 15-16, citing N.T. 718, 1086-87. However, "[i]f a private placement represents a more "restrictive" educational environment – one that does not maximize integration of disabled and nondisabled children, as required of public institutions under the IDEA – this does not render the placement 'inappropriate' for reimbursement purposes."  Coleman v. Pottstown Sch. Dist., 983 F. Supp. 2d 543, 568 (E.D. Pa. 2013), aff'd in part, 581 F. App'x 141 (3d Cir. 2014), citing Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80, 83-84 (3d Cir. 1999).

Finally, the District contends that "[o]nce the FBA from ASUA was completed in November [2013], it revealed that A.K. and N.K. were not doing well at the ASUA program,"

noting specifically that A.K. was reported to be screaming and crying, hitting, self-talking or

scripting during group instruction and exhibiting wandering behaviors ("elopement").  Dkt. No.

21 at ECF p. 15, <u>citing</u> ex. P-65.  "[T]he test for the parents' private placement is that it is

appropriate, and not that it is perfect."  <u>Warren G.</u>, 190 F.3d at 84.  Under this standard, I find

that the District has not set forth sufficient evidence to overcome the deference that I must give

to the Hearing Officer's finding that ASUA was a proper placement for A.K. and N.K. during the

2013-14 school year.

### D.    Equitable Considerations

Having concluded that the Hearing Officer correctly decided that District denied the

twins a FAPE when it failed to complete the 2013-14 IEPs prior to the start of the school year,

and that ASUA was an appropriate private placement, I must consider whether the Hearing

Officer erred when she determined that equitable considerations weighed in favor of an award of

tuition reimbursement to the twins, but only to December 2013.  Under IDEA's language, given

parents' unilateral placement of the twins at ASUA, tuition reimbursement is something which

the hearing officer or Court <u>may</u> require the District to provide – not something that the hearing

officer or Court must or shall require the District to provide.  Specifically, IDEA provides that

> [i]f the parents of a child with a disability . . . enroll the child in a
> private school without the consent of or referral by the public
> agency, a court or hearing officer <u>may</u> require the agency to
> reimburse the parents for the cost of that enrollment if the court or
> hearing officer finds that the agency has not made a free
> appropriate public education available to the child in a timely
> manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(c)(ii) (emphasis added).  "Even where a District is found to be in

violation of the IDEA and private school placement is deemed appropriate, 'courts retain

discretion to reduce the amount of a reimbursement award if the equities so warrant.'"  <u>C.H.</u>, 606

F.3d at 71, quoting Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 247 (2009).

      **1.**     **Decision to Award Tuition Reimbursement from September to December 2013**

Without conceding its arguments that the twins were not denied a FAPE and that ASUA was not an appropriate private placement, the District also argues that neither A.K. nor N.K. should have received any tuition reimbursement whatsoever – either from September to December 2013 or thereafter – because the equities weighed in the District's favor. To the extent that it is the District that challenges the Hearing Officer's determination to award partial tuition reimbursement, it is the District's burden to show that the tuition reimbursement awarded was not warranted. I find that it has not made the requisite showing.

Specifically, the District asserts that "Parents' request for tuition reimbursement should have been denied because Parents never had any intention of sending A.K. and N.K. to a Philadelphia public school. Dkt. No. 21 at ECF p. 42. It contends that the equities weigh in its favor because Parents unreasonably "intentionally delay[ed] enrolling A.K. and N.K. at the School District," "refus[ed] to review the IEP[s] at the June 2013 meeting;" failed to provide the District with the twins' independent evaluation reports until the final day of the 2012-13 school year; provided biased evaluations; failed to reveal their involvement and Donohue's involvement with ASUA; failed to respond to a District employee's "offer for an IEP meeting prior to the start of the school year;" and failed to timely inform the District that they were rejecting the June 2013 proposed IEP. Id. at ECF p. 43. Parents counter that "the Court should defer to the Hearing Officer's factual finding that 'the record in this case does not support a conclusion that Parents' actions were deceptive or otherwise unethical.[']" Dkt. No. 22 at ECF p. 39, citing A.K. Decision at 20 and N.K. Decision at 20.

The Hearing Officer found that "there was no evidence that Parents were committed to

sending [A.K. or N.K.] to the private school between February and June 2013." A.K. Decision

at 21; N.K. Decision at 21.  She also explained that "the equities of Parents' conduct must be

judged at the time it occurred, not in retrospect" and that

> although Parents were working toward establishing the private
> school and completing both the state private school license
> application and registration as a non-profit corporation, and
> continued throughout the summer to work on finding and
> preparing a location for [ASUA], they could not be certain . . . that
> they would succeed in getting the school established, or in
> obtaining a license, by the beginning of the 2013/14 school year.

A.K. Decision at 22; N.K. Decision at 22.  Giving due weight to the Hearing Officer's findings,

and after a review of the record, I find no reason to reject them.  See Munir v. Pottsville Area

Sch. Dist., 723 F.3d 423, 430 (3d Cir. 2013) ("Although the District Court must make its own

findings by a preponderance of the evidence, it is also required to afford due weight to the factual

findings of the hearing officer.").

### 2. Decision to Deny Tuition Reimbursement After the December 2013 IEP

For their part, parents challenge the Hearing Officer's conclusion that the December 2013

IEP relieved the District of liability for reimbursement for the twins' tuition at ASUA thereafter.

The Hearing Officer explained that, "[i]n October, 2013, . . . the parties met twice for IEP

meetings, which ultimately resulted in the District's offering an appropriate IEP, accompanied by

a NOREP, in December 2013." A.K. Decision at 19; N.K. Decision at 19.  Because parents

challenge the hearing officer's decisions on this issue, it is their burden to show that the Hearing

Officer erred when she found that neither of the twins was entitled to an award of tuition

reimbursement beyond the District's offered December 2013 IEPs.

Parents argue that the Hearing Officer's holding "directly contradicts her own legal

conclusion that the District had to make an offer of an appropriate program and placement prior

to the start of the school year." Dkt. No. 22 at ECF p. 44.  In support of their argument, parents cite Norristown Area Sch. Dist. v. Frank. C., No. 13-5612, at Dkt. No. 20, ECF p. 22-23 n.9 (E.D. Pa. June 18, 2014), a case where the Court rejected the District's argument that because its April 2013 IEP offered a FAPE, the parents were barred from bringing a claim for tuition reimbursement from April going forward.  Frank C. is distinguishable on its facts.  The Court found that, under the circumstances of the case, where only a few months remained in the school year, "IDEA would not require the Parents to either (a) uproot Frankie from his then-current placement or (b) forfeit their right to seek tuition reimbursement." Id.  The Court explained that "the record strongly suggests that this change would have been particularly hard on Frankie." Id. Here, parents have not made a similar showing that either of the twins would have been particularly adversely affected by a transition from ASUA to the District's proposed autism support classroom at the beginning of 2014, after the first four months of their kindergarten year.

Further, the hearing officer's decisions that the twins were not offered a FAPE at the start of the school year is grounded in her conclusion that "[t]he District cannot unilaterally make essential decisions for an eligible child and worry about technical compliance with IDEA procedures a[t] some later date." A.K. Decision at 19; N.K. Decision at 19.  The District ultimately remedied its failure to sufficiently involve parents in the development of the twins' IEPs when it conducted additional IEP meetings during the Fall of 2013 and further revised the proposed IEPs.  After the start of the school year, the District provided parents with an opportunity to participate in the development of the twins' IEPs and parents were afforded a sufficient opportunity to exercise their "procedural right to inquire whether the proposed school location had the resources set forth in the IEP." C.U., 23 F. Supp. 3d at 227.

"[O]nce a court holds that the public placement violated IDEA, it is authorized to 'grant

such relief as the court determines is appropriate.'"  <u>Carter</u>, 510 U.S. at 15-16, <u>quoting</u> 20 U.S.C.

§ 1415(e)(2).  As the Supreme Court explained in <u>Carter</u>, "equitable considerations are relevant

in fashioning relief, . . . and the court enjoys broad discretion in so doing . . . .  Courts fashioning

discretionary equitable relief under IDEA must consider all relevant factors, including the

appropriate and reasonable level of reimbursement that should be required."  510 U.S. at 16

(internal quotation and citation omitted).  The Hearing Officer was not wrong to consider that the

District offered revised IEPs to the twins in December in concluding the District no longer failed

to provide the twins with a FAPE after the District made its December 2013 IEP proposals

(indeed, the District offered revised IEPs in response to parents' continued engagement in the

IEP process after the start of the 2013-14 school year).

To the extent that parents contend that the December 2013 IEPs were insufficient to

provide the twins with a FAPE, I disagree.  I find that the Hearing Officer correctly concluded

that  "[a]lthough the final proposed IEP did not provide every service Parents requested and in

the manner Parents believe is best for [A.K. or N.K.], the record establishes that the [autism

support] program and classroom the District proposed are reasonably likely to result in

meaningful progress, overall."  A.K. Decision at 19; N.K. Decision at 19.  IDEA only requires

the District to provide an appropriate education, and "[w]hatever Congress meant by an

'appropriate' education, it is clear that it did not mean a potential-maximizing education."

<u>Rowley</u>, 458 U.S. at 197 n. 21.

Whether or not the District's December 2013 IEPs afforded the twins a FAPE is,

however, not the end of the question when it comes to determining whether parents should be

reimbursed for the twins' tuition at ASUA in December 2013 and beyond, as is further set forth

below.

####     E.       Stay-Put

Parents also contend that "the Hearing Officer committed legal error when she limited tuition reimbursement based upon her conclusion that the December, 2013 IEP was appropriate" because IDEA's stay-put provision permits the twins to stay put at ASUA at the District's expense for the duration of their due process challenge.[26]  See Dkt. No. 26 at ECF p. 37.  IDEA provides that:

> during the pendency of any [appeal] proceedings, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j).  This procedural safeguard, commonly known as the "stay-put" or "pendent placement" provision, "functions, in essence, as an automatic preliminary injunction."  Drinker by Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 (3d Cir. 1996) (discussing the identical provision when it was codified at § 1415(e)(3)); see also D.M. v. New Jersey Dep't of Educ., No. CIV.A. 14-4620 ES, 2014 WL 4271646, at *6 (D.N.J. Aug. 28, 2014) (holding the "stay-put protection is automatic under federal law. . . . And, . . . it is clear that a District Court can issue an injunction based on the stay-put provision of IDEA.").  The stay-put provision reflects "Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved."[27]  Drinker, 78 F.3d at 864; see also Ashland

---

[26]       The Hearing Officer's decisions did not address the effect of 20 U.S.C. § 1415(j) on the availability of tuition reimbursement after the District offered the twins a FAPE. Likewise, the District does not directly address parents' argument that they are entitled to tuition reimbursement for the twins' placement at ASUA, at least through the duration of their due process proceedings pursuant to IDEA's stay put provision.

[27]       Accordingly, in Susquenita Sch. Dist. v. Raelee S. by & through Heidi S., 96 F.3d

Sch. Dist. v. V.M., 494 F. Supp. 2d 1180, 1182 (D. Or. 2007) ("The stay-put provisions strive to

ensure the child is not treated as a ping-pong ball, ricocheting between placements with each new

ruling in the dispute between parents and school.").  The stay-put requirement was triggered

when parents filed their due process complaints.

　　　　To decide whether the stay-put provision requires tuition reimbursement beyond the date

of the December 2013 IEP, it is first necessary to identify the twins' "then-current educational

placement." § 1415(j); Drinker, 78 F.3d at 865 n.13.  Parents argue that "[i]t certainly cannot be

the case that the Hearing Officer's finding that [the December 2013] IEP was appropriate can

change the pendency of the parental placement."  Dkt. No. 26 at ECF p. 37.  I agree.  The Court

of Appeals has explained that

> an administrative ruling validating the parents' decision to move
> their child from an IEP-specified public school to a private school
> will, in essence, make the child's enrollment at the private school
> her "then-current educational placement" for purposes of the stay-
> put rule.  Having been endorsed by the State, the move to private
> school is no longer the parents' unilateral action, and the child is
> entitled to "stay put" at the private school for the duration of the
> dispute resolution proceedings.

M.R. v. Ridley Sch. Dist., 744 F.3d 112, 119 (3d Cir. 2014), cert. denied, 135 S. Ct. 2309, 191 L.

Ed. 2d 977 (2015).  The Hearing Officer's decisions that the District did not offer appropriate

---

78, 86 (3d Cir. 1996), the Court of Appeals reasoned that

> where parents who disagree with an IEP proposal for their child
> wait for the merits of their case to be addressed through the process
> of administrative and judicial review, they must make a choice.
> They may have the child remain in what they believe to be an
> inappropriate placement or they may elect to pay for what they
> deem appropriate.  This choice is real only for parents who have
> the financial wherewithal to pay for alternative placement.  While
> parents who reject a proposed IEP bear the initial expenses of a
> unilateral placement, the school district's financial responsibility
> should begin when there is an administrative or judicial decision
> vindicating the parents' position.

IEPs at the beginning of the 2013-14 school year effectively endorse parents' initial decision to enroll the twins at ASUA and makes ASUA the twins' pendent placement for purposes of § 1415(j).  See Dist. of Columbia v. Oliver, 991 F. Supp. 2d 209, 214 (D.D.C. 2013) ("Where, as here, no IEP has been prepared or implemented, the 'current educational placement' will be the place where the child is actually receiving instruction at the time the dispute arises, provided there has been some sort of administrative determination that the location is appropriate."). Under the stay-put provision, and the Court of Appeals' decision in M.R., the District is obligated to fund the twins' education at ASUA for the entirety of the 2013-14 school year even though the Hearing Officer also found that the District offered the twins a FAPE in December 2013.[28]  But cf. T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 171-72 (2d Cir. 2014) (finding that "IDEA does not bar [the District] from subsequently correcting its mistake" and finding that, "if the present dispute extends into future school years . . . and [the District offers to provide appropriate services] for those years, then . . . parents must either accept that offer for [their child] or else take on the full cost of obtaining the necessary services from private providers"); Gabel ex rel. L.G. v. Board of Educ. of Hyde Park Central School Dist., 368 F. Supp. 2d 313, 325 (S.D.N.Y. 2005) ("An agreement in which a Board of Education agrees to pay tuition to a private school makes that school the child's pendency placement *unless the*

---

[28]       As the Court of Appeals explained in M.R.,

> [I am] not insensitive to the financial burden [this] decision will impose on [the District], . . . or the seeming incongruity of the ultimately prevailing party having to pay for a now-rejected placement.  . . . It is impossible, however, to protect a child's educational status quo without sometimes taxing school districts for private education costs that ultimately will be deemed unnecessary by a court.

744 F.3d at 128.

*stipulation is explicitly limited to a specific school year or definite time period.*"[29]) (emphasis added).

## II.    District's Motion Regarding Parent's Counterclaims:  2014-15 School Year

### A.    Subject-Matter Jurisdiction

The District moves to dismiss parents' counterclaims "to the extent that they seek reimbursement for tuition, transportation and other costs of attendance at [ASUA] for the 2014-15 school year[ ] for lack of subject-matter jurisdiction because [parents] failed to exhaust their administrative remedies," Dkt. No. 20 at ECF p. 3, as the 2014-15 school year "was not the subject of the administrative proceedings under review" and "Parents did not file a due process complaint for relief regarding the 2014-15 school year." Id. at ECF p. 9.[30]  Parents contend that the Court has jurisdiction to review their claims with respect to the IEPs offered to the twins for 2014-15 because "the issue between the parties remains the same and is identical to the issue litigated in the due process hearing." Dkt. No. 24 at ECF p. 11.  I agree with parents that I have jurisdiction over their claims for the 2014-15 school year.

My colleague recently considered similar circumstances in J.N. v. Penn-Delco Sch. Dist.,

---

[29]    Arguably the Hearing Officer's decisions limit her findings that ASUA was the appropriate placement to a "definite time period" – the period between September and December 2013, when she found the District's offered IEPs were sufficient to deliver a FAPE to the twins. But neither IDEA nor any Third Circuit precedent provide for limiting the reimbursement due to parents under the stay-put provision in the unique circumstances now before me, where the hearing officer's decision validates the parents' decision to initially enroll the twins at ASUA, but also finds that the twins' were not entitled to remain at the private placement after the District offered sufficient IEPs.

[30]    Parents did check the box requesting a due process hearing when they rejected the proposed 2014-15 IEPs.  Dkt. No. 12-2 at ECF p. 4.  The District did not move to dismiss parent's counterclaims for lack of subject matter jurisdiction when they were filed.  Nor did the District assert lack of jurisdiction in its answers to parents' counterclaims.  It did, however, assert that parents "failed to exhaust their administrative remedies for claims relating to the 2014-1015 school year."  Civ. A. 14-4910, Dkt. No. 9 at ECF p. 12; Civ. A. 14-4911, Dkt. No. 8 at ECF p. 12.

and concluded that the Court had jurisdiction to decide the appropriateness of an IEP created

after the close of the administrative proceedings which were under review.  57 F. Supp. 3d 475,

481 (E.D. Pa. 2014).  The Court explained, "[n]ew issues may require exhaustion, but

substantially similar persisting issues that have already been raised do not require reexhaustion."

Id. at 479; see also Johnson v. Lancaster-Lebanon Intermediate Unit 13, Lancaster City Sch.

Dist., 757 F. Supp. 606, 614 n.6 (E.D. Pa.1991) (finding reexhaustion was not required due to the

similarity between the IEP under review in the administrative hearing and the subsequent year's

IEP); A.A. v. Clovis Unified Sch. Dist., No. 13-1043, 2015 WL 4068964, at *4 (E.D. Cal. July 2,

2015) (holding that parents "are not required to re-exhaust administrative remedies when they

are not adding claims, but are adding facts that did not exist at the time of filing that support

already existing claims" where parents' "arguments regarding the eighth and ninth-grade IEPs

were raised in the hearing on the seventh-grade IEP").  Even if "many of the goals/baselines

were updated" when the District offered updated IEPs in June 2014, the proposed June 2014

IEPs were "for the same program and placement . . . ."  Dkt. No. 28 at ECF p. 3.  For the 2014-

15 school year, the District proposed to place the twins in the same autistic support classroom as

it had proposed in 2013-14.  It also proposed to provide them with the same frequency of

services for speech and occupational therapy.  Parents' objections to the District's proposed

placements, services and goals for the twins remain substantially the same.  On the record before

me, "[g]iven the substantial similarity of the [2013-14 and 2014-15] IEPs, and in light of this

Court's institutional capacity to determine whether relief is warranted for this subsequent year,

the Court finds that [parents] . . . are not required to reexhaust their administrative remedies" for

their claims pertaining to the 2014-15 school year.  J.N., 57 F. Supp. 3d at 481.

### B.      Tuition Reimbursement

Because I will not dismiss parents claims regarding the 2014-15 school year for lack of subject-matter jurisdiction, I consider the District's argument that judgment should be granted in its favor "for the reason that there are no genuine disputes as to material facts as to the School District's non-liability for tuition reimbursement for the 2014-15 school year."  Dkt. No. 20 at ECF p. 4.  The District contends that "if the last IEPs offered by the School District offered FAPE for the 2013-14 school year, the same IEPs should offer FAPE for the following school year, if the parents chose to enroll their [children] in the School District's schools." [31]  Id. 20 at ECF p. 9-10.

Parents acknowledge that "the IEPs offered for the 2013-14 school and the IEPs offered for the 2014-15 school year offered essentially the same program."  Dkt. No. 24 at ECF p. 17. They argue, however, that

> the District continued to deny FAPE for the 2014-15 school year by proposing IEPs that denied 1:1 instruction using Applied Behavior Analysis; failed to provide a home provided highly inadequate amount of speech/language therapy and occupational therapy; failed to provide a home-based ABA program; failed to provide supervision by a Board-Certified Behavior Analyst; failed to provide individual speech therapy; failed to provide sensory integration services; failed to make adequate provision for paraprofessional training; failed to provide for social learning through supported, structures interactions with peers in small groups; and failed to provide for coordination and communication for home and school.

Id. at ECF p. 18.

"IDEA does not require a FAPE to be a perfect or ideal education."  Jalen Z. v. Sch. Dist. of Phila., No. 13-4654, 2015 WL 2343690, at *3 (E.D. Pa. May 15, 2015).  A school district

---

[31]      Elsewhere the District argues that "[t]here are . . . factual issues whether [parents] waived their right to seek tuition reimbursement for the 2014 - 2015 school year and withdrew the students from the School District . . . ."  Dkt. No. 28 at ECF p. 3.

need not "maximize the potential of every handicapped child, [but] must supply an education

that provides 'significant learning' and 'meaningful benefit' to the child." Ridley, 680 F.3d at

269 (internal citations omitted).  I find that, as with the December 2013 IEPs, the IEPs offered by

the District for the 2014-15 school year are reasonably likely to result in the requisite significant

learning and meaningful benefit.  Accordingly, the District offered each of the twins a FAPE for

2014-15.

However, as with the 2013-14 school year, under IDEA's stay put provision and the

Court of Appeals' decision in M.R., parents are entitled to tuition reimbursement for the 2014-

15 school year even if the IEPs offered by the District for 2014-15 provided the twins with a FAPE.

See M.R., 744 F.3d at 124 ("Nothing in the statute or this circuit's law provides a basis for

changing [a student's] stay-put placement back to the public school during the pendency of the

dispute process, notwithstanding the school district's successful appeal of the administrative

decision.").  But cf. J.E. v. Boyertown Area Sch. Dist., 807 F. Supp. 2d 236, 240 (E.D. Pa. 2011)

(finding that "to require that the stay-put provision applies during a federal appeal could yield

absurd results.  Parents could continue to appeal to the Third Circuit and then the Supreme Court

forcing a school district to reimburse private school tuition where multiple levels of review have

found that the IEP offered to the child provides a FAPE.").  The District is obligated to fund the

twins' education at ASUA for the entirety of the 2014-15 school year.

**C.   ADA and Section 504**

In its motion, the District also seeks judgment in its favor[32] on parents' counterclaims

---

[32]     The District also argues that because parents' counterclaims "fall within the ambit
of IDEA," they require exhaustion and must be dismissed for lack of subject-matter jurisdiction."
Dkt. No. 20 at ECF p. 8.  As is set forth above, I find that parents have sufficiently exhausted
IDEA's administrative process with respect to their claims for the 2013-14 and 2014-15 school

under Section 504 of the Rehabilitation Act and the ADA.  "A plaintiff claiming deprivation of a FAPE frequently seeks relief under the IDEA, Section 504 [of the Rehabilitation Act] and the ADA."  M.M. & E.M., individually & on behalf of S.M. v. Sch. Dist. of Phila., No. 14-6061, 2015 WL 6689855, at *2 (E.D. Pa. Nov. 3, 2015).  "IDEA provides an affirmative duty to provide education, whereas the Rehabilitation Act prohibits discrimination against the disabled."  EK ex rel. A.G. v. Warwick Sch. Dist., No. 09-4205, 2014 WL 737328, at *15 (E.D. Pa. Feb. 26, 2014).  "[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same."  Ridley, 680 F.3d at 282-83.  To prevail on their claims under Section 504 and the ADA, parents must show that A.K. and N.K. have a disability, were otherwise qualified to participate in a school program, and were denied the benefits of the program or otherwise subject to discrimination because of their disability.  See C.G. v. Pa. Dep't of Educ., 735 F.3d 229, 235 (3d Cir. 2013).  "[C]laims for compensatory damages under § 504 of the [Rehabilitation Act] & § 202 of the ADA also require a finding of intentional discrimination."  S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 261 (3d Cir. 2013).  "A showing of deliberate indifference satisfies that standard."  D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 269 (3d Cir. 2014).  "[D]eliberate indifference must be a deliberate choice, rather than negligence or bureaucratic inaction."  S.H., 729 F.3d at 263 (internal citations and quotations omitted).

The District asserts that parents "have failed to produce evidence sufficient to support a finding of intentional discrimination."  Dkt. No. 20 at ECF p. 15.  It argues that "[t]he evidence is overwhelming and undisputed that the School District took steps to provide meaningful educational opportunities to A.K. and N.K. during the relevant time period."  Id. at ECF p. 16.  It

---

years and thus will not dismiss parents' counterclaims under Section 504 and the ADA for lack of subject-matter jurisdiction.

further contends that "[t]here is no evidence that A.K. and N.K. were excluded from any school activities available to all students or that benefits were withheld from them or that they were treated differently by school officials because of their disabilities." Id.  Parents argue that the "District fails to support its assertions by citing to particular materials in the administrative record or the supplemental evidence received by the Court," Dkt. No. 24 at ECF p. 9, and assert that "abundant evidence of record shows that the District acted with deliberate indifference in violating the [twins'] rights under Section 504 and the ADA.  [Or, a]t  the very least, the record reflects a dispute of material fact on that issue." Id. at 24-25.  Parents contend that "the failure to develop an IEP for either [child] in the fall of 2013 is sufficient to establish deliberate indifference." Id. at ECF p. 25.

I find that there is no genuine dispute of material fact that the standard for deliberate indifference has not been met in these cases.  Although there is evidence that the District failed to sufficiently follow through with the IEP process over the summer, on the record before me any lapses by the District were negligent, not deliberate.  See, e.g., Ex. P. 94 at 5 (explaining that the special education liaison "was supposed to be working on this IEP over the summer with the parents").  Further, to the extent that parents seek declaratory, injunctive, or equitable relief, they must still show the District failed "to ensure meaningful participation in educational activities and meaningful access to educational benefits." Ridley, 680 F.3d at 280 (citations omitted).  While the District had not finalized IEPs for either of the twins at the start of the 2013-14 school year, it did offer the twins placements in a District autism support classroom and the placement it offered was sufficient to afford the twins a FAPE.  There is no evidence that the twins would have been denied the benefits of a school program because of their disability if parents had enrolled the twins in the offered autism support classroom pending finalization of their IEPs.

-43-

Accordingly, I will grant the District's motion to the extent that it seeks summary judgment in the District's favor with respect to parents' counterclaims under Section 504 of the Rehabilitation Act and the ADA.

**III.   Parents' Motion for Leave to Amend:  2015-16 School Year**

Finally, on October 28, 2015, parents filed a motion for leave to amend[33] their counterclaim, seeking leave to amend paragraph 3 of the "Relief Requested" section of the Counterclaim to request tuition reimbursement for the 2015-2016 school year in addition to the 2013-2014 and 2014-2015 school years.  See Dkt. No. 27.  The District opposes parents' motion. Dkt. No. 28.

The District contends that amendment is not warranted because parents' motion seeking leave to amend, which was filed well after the start of the current school year, is untimely.  Dkt. No. 28 at ECF p. 2-3.  It also argues that "[t]here are factual issues as to whether the IEP offered for the 2015 – 2016 school year is substantially similar to the IEP considered by the Hearing Officer" and factual issues remain as to whether parents "notified the School District that they intended to enroll the students in the School District for the 2015 – 2016 school year."  Id.

Parents argue that "it would be appropriate to allow amendment" because "there is no indication that the IEPs for A.K. and N.K. [for 2015-16] would be any different than the December, 2013 program currently under review."  Dkt. No. 27 at ECF p. 10 n.1.  In support of their argument, parents assert that "the District has not offered a different program for the 2015-

---

[33]       Though Rule 15 of the Federal Rules of Civil Procedure dictates that "leave to amend shall be freely given when justice so requires," Fed. R. Civ. P. 15(a)(2), "the grant or denial of an opportunity to amend is within the discretion of the District Court . . . ."  Foman v. Davis, 371 U.S. 178, 182 (1962).  Leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  Id.

16 school year." Id.  But parents do not contend that there are active IEP proposals on the table

for the twins for the 2015-16 school year or even that they made any attempts to engage in the

IEP process with the District for the current school year.  Parents also argue that it is

"appropriate to allow amendment of the Counterclaim to assert a request for [tuition

reimbursement] for the 2015-2016 school year because, "notwithstanding the outcome of the

appeal A.K. and N.K. are entitled to continued funding of their private placement until the

conclusion of this litigation" by virtue of IDEA's stay put protections.  Id. at ECF p. 9.  The

District does not address parents' argument regarding the applicability of the stay put provision

to the 2015-16 school year.

       I agree with parents that IDEA's stay put provision obligates the District to continue to

reimburse parents for the twins' tuition until their claims with respect to the 2013-14 and 2014-

15 school years are resolved.  See M.R., 744 F.3d at 125 ("the statutory language and the

"protective purposes" of the stay-put provision lead to the conclusion that Congress intended

stay-put placement to remain in effect through the final resolution of the dispute").  "A main

point of the "stay-put" provision in IDEA is to protect individual students while educational

regulators and those interested in a child's education are working out disputes."  D.M. v. New

Jersey Dep't of Educ., 801 F.3d 205, 218 (3d Cir. 2015); see also Drinker, 78 F.3d at 865 ("the

purpose of the 'stay put' is to preserve the status quo of the child's functioning placement and

program until the *underlying IDEA litigation is resolved*, unless there is an effective waiver of

the protection of the 'stay put'") (emphasis in original) (internal citations and quotations

omitted).

       However, I do not find that the stay put provision obligates me to permit parents to

amend their complaint to assert a claim that the District denied either of the twins a FAPE for the

2015-16 academic year.  Indeed, I have been given no information whatsoever with respect to

the IEPs offered (or not offered) for either of the twins in 2015-16.  Absent such information, I

am unable to consider even whether I would have jurisdiction over the claims for 2015-16, as I

cannot determine whether any claims parents might have with respect to the 2015-16 school year

are substantially similar to the claims raised in the administrative proceeding.  Nor do I have any

information which would permit me to determine that parents have "given the public school a

good faith opportunity to meet its obligations" for the 2015-16 school year.[34]  See C.H. v. Cape

Henlopen Sch. Dist., 606 F.3d 59, 72 (3d Cir. 2010) ("IDEA was not intended to fund private

school tuition for the children of parents who have not first given the public school a good faith

opportunity to meet its obligations.").  Accordingly I decline to exercise my discretion to grant

leave to amend.

       An appropriate Order follows.

_____

[34]     As the Court of Appeals explained in C.H.,

> The stay-put provision merely ensures that a disabled child's
> educational services are not altered or reduced until the parent has
> an opportunity to avail herself of the appeal procedures.  The stay-
> put provision was never intended to suspend or otherwise frustrate
> the ongoing cooperation of parents and the school district to reach
> an amenable resolution of a disagreement over educational
> services.  In fact, the IDEA specifically obligates the parents to
> participate in a resolution session with the school district after a
> due process request is filed "where the parents of the child discuss
> their complaint, and the facts that form the basis of the complaint,
> and the local educational agency is provided the opportunity to
> resolve the complaint."  . . . The inclusion of a mandatory
> resolution session clearly reflects Congress' intention that parents
> and school districts continue to work toward the resolution of
> disputes and the provision of appropriate educational services even
> after a due process request is filed.

606 F.3d at 72, quoting 20 U.S.C. § 1415(f)(1)(B)(i)(IV).